## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

SAINT FRANCIS HOSPITAL, INC.,      )
AHS HILLCREST MEDICAL CENTER, LLC,      )
and ST. JOHN MEDICAL CENTER,      )
                                                     )
              Plaintiffs,      )
                                                     )
v.      )      Case No. 19-CV-170-GKF-JFJ
                                                     )
ALEX M. AZAR, II, Secretary,      )
U.S. Department of Health and Human Services,      )
                                                     )
              Defendant.      )

## OPINION AND ORDER

Plaintiffs Saint Francis Hospital, Inc., AHS Hillcrest Medical Center, LLC, and St. John Medical Center (collectively, Providers) bring this suit under Title XVIII of the Social Security Act, *as amended*, seeking judicial review of the January 25, 2019 decision of the Provider Reimbursement Review Board (PRRB), designated Decision Number 2019-D11.  The parties filed opposing briefs on the issue: the Motion for Summary Judgment [Doc. 30] of the Providers and the Motion for Judgment on the Administrative Record [Doc. 33] of defendant Alex M. Azar, II, the Secretary of Health and Human Services (the Secretary).  For the reasons set forth below, the court concludes that Decision Number 2019-D11 is not arbitrary, capricious, an abuse of discretion, or contrary to law.

### I.      Factual and Regulatory Background

"Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* (2006), establishes the federally funded health insurance program for the aged and disabled, commonly known as Medicare."  *Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259, 1261 (10th Cir. 2007), *abrogated on other ground by, Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019).  The Medicare

program provides reimbursement to hospitals for both direct graduate medical education costs (direct GME) and indirect costs of medical education (IME).  42 U.S.C. §§ 1395ww(d)(5)(B), (h).  The amount reimbursable by Medicare for direct GME and IME depends, in part, on the number of full-time equivalent (FTE) residents trained by the hospital during the reporting year.  42 C.F.R. §§ 412.105(a)(1), 413.76(a).   In 1986, Congress amended the Medicare statute to permit the inclusion of time spent by residents in nonhospital settings towards determining FTE for purposes of direct GME payments owed "if the hospital incurs all, or substantially all, of the costs for the training program in that setting."  Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9314(a), *codified at*, 42 U.S.C. § 1395ww(h)(4)(E).  Similarly, in 1997, Congress amended the Medicare statute to authorize inclusion of time spent by residents or interns in a nonhospital setting to determine FTE for purposes of IME "if the hospital incurs all, or substantially all, of the costs for the training program in that setting."  Balanced Budget Act of 1997, Pub. L. 105-33, § 4621(b)(2), *codified at,* 42 U.S.C. § 1395ww(d)(5)(B)(iv).

In 2010, Congress enacted § 5504 of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010) (ACA), which amended the Medicare statute.  Specifically, § 5504 amended § 1395ww(h)(4)(E) of the Medicare statute—related to direct GME—to insert the following prefatory statement before the existing language related to calculation of FTE:  "effective for cost reporting periods beginning before July 1, 2010."  The ACA also amended §1395ww(h)(4)(E) to include the following new clause:

> [E]ffective for cost reporting periods beginning on or after July 1, 2010, all the time so spent by a resident shall be counted towards the determination of full-time equivalency, without regard to the setting in which the activities are performed, if a hospital incurs the costs of the stipends and fringe benefits of the resident during the time the resident spends in that setting.  If more than one hospital incurs these costs, either directly or through a third party, such hospitals shall count a proportional share of the time, as determined by written agreement between the hospitals, that a resident spends training in that setting.

42 U.S.C. § 1395ww(h)(4)(E)(ii).  Additionally, § 5504 of the ACA amended § 1395ww(d)(5) of the Medicare statute—related to IME—to insert the following prefatory statement before the existing language related to calculation of FTE:  "[e]ffective for discharges occurring on or after October 1, 1997, and before July 1, 2010."  The Act also amended § 1395ww(d)(5) to include the following new clause:

> Effective for discharges occurring on or after July 1, 2010, all the time spent by an intern or resident in patient care activities in a nonprovider setting shall be counted towards the determination of full-time equivalency if a hospital incurs the costs of the stipends and fringe benefits of the intern or resident during the time the intern or resident spends in that setting.  If more than one hospital incurs these costs, either directly or through a third party, such hospitals shall count a proportional share of the time, as determined by written agreement between the hospitals, that a resident spends training in that setting.

42 U.S.C. § 1395ww(d)(5)(B)(iv)(II).  Subsection (c) of § 5504 states as follows:

> The amendments made by this section shall not be applied in a manner that requires reopening of any settled hospital cost reports as to which there is not a jurisdictionally proper appeal pending as of the date of the enactment of this Act on the issue of payment for indirect costs of medical education under section 1886(d)(5)(B) of the Social Security Act (42 U.S.C. § 1395ww(d)(5)(B)) or for direct graduate medical education costs under section 1886(h) of such Act (42 U.S.C. 1395ww(h)).

The Providers are Medicare-certified acute care hospitals located in Tulsa, Oklahoma.  [AR 000026].  From 2001 to 2007, the Providers each operated graduate medical education programs for interns and residents in various specialty areas in affiliation with the University of Oklahoma/University of Oklahoma College of Medicine, Tulsa (University).  [*Id.*].  To that end, the Providers were members of the Tulsa Medical Education Foundation, Inc. (Foundation), which was established to administer the training of residents in hospital and nonhospital settings.  [AR 000027].

The Providers executed written Graduate Medical Education Affiliation Agreements with the University (Affiliation Agreements).  [*Id.*].  Pursuant to the Agreements, the Providers *together* incurred "all or substantially all" of the costs for the training programs in the Nonhospital Clinics, as defined in 42 C.F.R. § 413.78, to which the FTEs rotated.  [AR 000029].

From Fiscal Years 2001 through 2006, the Providers claimed intern and resident FTEs in their cost reports to reflect intern and resident time spent in patient care activities at Nonhospital Clinics in connection with approved medical residency training programs (Claimed FTEs).[1]  [AR 000027].  The Medicare Contractor initially approved the Providers' Medicare reimbursement for resident training at Nonhospital Clinics, the documentation of which included the Claimed FTEs.  [AR 000028].  However, in 2007, the Medicare Contractor reopened the Providers' FY 2001 through FY 2006 cost reports, and removed the Claimed FTEs based on its determination the Providers did not individually (that is, one hospital alone) incur "all or substantially all of the costs for a training program in a nonhospital setting."  [*Id.*; AR 000340-000384; AR 000390-000399].  The Providers appealed the disallowances to the PRRB.  [AR 000028; AR 000125-000169].  After several years of procedural back and forth, on January 25, 2019, the PRRB issued the Decision, concluding that the Medicare Contractor "properly reduced the Providers' GME and IME FTE resident counts to exclude resident rotations spent in nonhospital settings for the fiscal years at issue."  [Doc. 1-1, p. 15].  Because the CMS Administrator declined to review the PRRB's decision, [AR 000018], the PRRB's decision constitutes the final decision of the Secretary in this matter.  *See* 42 U.S.C. § 1395oo(f).

---

[1] Saint Francis Hospital also claimed these costs in Fiscal Year 2007.

## II.     Standard of Review

The Providers seek judicial review pursuant to 42 U.S.C. § 1395oo(f)(1), which incorporates the Administrative Procedure Act's standard of review.[2]  5 U.S.C. § 706; *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).  Pursuant to the Administrative Procedure Act, the court shall set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

The Tenth Circuit has stated

[a]n agency's action is arbitrary and capricious where the agency

(1) entirely fail[s] to consider an important aspect of the problem, (2) offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise, (3) fail[s] to base its decision on consideration of the relevant factors, or (4) ma[kes] a clear error of judgment.

*N.M. Health Connections v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1138, 1162 (10th Cir. 2019) (quoting *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013)).  However, the scope of review is "narrow."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019).  The court must determine only "whether the Secretary examined 'the relevant data' and articulated 'a satisfactory explanation' for his decision, 'including a rational connection between the facts found and the choice made.'"  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of the*

---

[2] In the Amended Complaint and Motion for Summary Judgment, the Providers also invoked the federal mandamus statute, 28 U.S.C. § 1361.  The Secretary argues that mandamus jurisdiction does not apply.  [Doc. 34, pp. 29-30 n.11].  In the Providers' Response in Opposition to the Secretary's Motion for Judgment on the Administrative Record and Reply to the Secretary's Opposition to the Providers' Motion for Summary Judgment [Doc. 38], the Providers state "[s]ince the Court clearly has jurisdiction under 42 U.S.C. § 1395oo(f)(1), the Secretary's contention [that mandamus is inappropriate] is largely academic, and the Hospitals will not further dispute it here." [Doc. 38, p. 22 n.14].  Thus, the court does not consider the federal mandamus statute.

*United States, Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).  The court cannot "substitute [its] judgment for that of the Secretary," and must confine itself "to ensuring that he [or she] remained 'within the bounds of reasoned decisionmaking.'" *Id.* (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 105 (1983)).

The Tenth Circuit generally applies the two-step test established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, *Inc.,* 467 U.S. 837 (1984), to determine whether an agency acted within its statutory authority.  *WildEarth Guardians v. U.S. Fish & Wildlife Serv*., 784 F.3d 677, 683 (10th Cir. 2015).  Pursuant to the *Chevron* test, the court must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A.,* 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43.  If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

In the Tenth Circuit, "[r]eviews of agency action in the district courts must be processed *as appeals*." *Olenhouse v. Commodity Credit Corp*., 42 F.3d 1560, 1580 (10th Cir. 1994) (emphasis in original).  Thus, "the district court should govern itself by referring to the Federal Rules of Appellate Procedure," and the court's review is confined to the administrative record. *Id.; see also N.M. Health Corrections,* 946 F.3d at 1161.

### III.   Analysis

The Providers generally argue that §§ 5504(a) and (b) of the ACA "explicitly allowed hospitals to share the costs of resident training at nonhospital locations and to claim the proportionate FTEs," and that § 5504(c) of the Act "allowed hospitals with pending appeals—like the [Providers]—to benefit from the statutory change." [Doc. 30, pp. 11-12].  Thus, the Providers

contend that the Secretary's interpretation of § 5504 to the contrary is flawed—and therefore the January 25, 2019 Decision was arbitrary, capricious, and in excess of its statutory authority—for three primary reasons:  (1) the Secretary's interpretation renders § 5504(c) superfluous; (2) it contradicts the plain-meaning of 42 C.F.R. § 413.78(g)(6) (2010); and (3) the policy did not undergo proper notice and comment rulemaking.  [Doc. 30, pp. 28-29].  Alternatively, the Providers contend that the Claimed FTE must be counted under pre-ACA laws and regulations. The court separately considers each argument.

### A.    *Superfluousness of § 5504(c)*

The Providers first argue that the Secretary's interpretation of § 5504(c) to not require reopening of cost reports with pending appeals of IME and direct GME on the date of the enactment of the ACA renders the entirety of § 5504(c) superfluous.

Generally, it is the duty of the court "to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker,* 533 U.S. 167, 174 (2001) (quoting *United States v. Menasche,* 348 U.S. 528, 538-39 (1955)).  The U.S. Supreme Court has therefore expressed its "'reluctan[ce] to treat statutory terms as surplusage' in any setting." *Id.* (quoting *Babbitt v. Sweet Home Chapter, Cmtys. for a Great Ore.*, 515 U.S. 687, 698 (1995)).  However, "the canon against superfluity assists only where a competing interpretation gives effect 'to every clause and word of a statute.'" *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011) (quoting *Duncan*, 533 U.S. at 174); *see also Marx v. Gen. Revenue Corp.,* 568 U.S. 371, 385 (2013) ("The canon against surplusage is not an absolute rule."); *Corley v. United States*, 129 S. Ct. 1558, 1572 (2009) (Alito, J., dissenting) ("Like other canons, the antisuperfluousness canon is merely an interpretive aid, not an absolute rule.").

Section 5504(c) states "[t]he amendments made by this section shall not be applied in a manner that requires reopening of any settled hospital cost reports *as to which there is not a jurisdictionally proper appeal pending* as of the date of the enactment of [the ACA]" on the issue of IME or direct GME costs.  The Providers construe the phrase "as to which there is not a jurisdictionally proper appeal pending" to require the reopening of cost reports with pending appeals of IME and direct GME and to permit § 5504(a) and § 5504(b) to apply to those appeals.  However, the Providers' proposed interpretation conflicts with the plain language of § 5504.  Pursuant to the ACA, the new standard established by § 5504(a)—permitting more than one hospital to share in direct GME—is "effective for cost reporting periods beginning on or after July 1, 2010."  Likewise, the new § 5504(b) standard for IME is "[e]ffective for discharges occurring on or after July 1, 2010."  The statutes have separate standards, that do not explicitly permit multiple hospitals to share costs, that apply to cost reporting periods and discharges prior to July 1, 2010.  42 U.S.C. § 1395ww(h)(4)(E)(i); 42 U.S.C. § 1395ww(d)(5)(B)(iv)(I).  The Providers' proposed interpretation would render the distinction meaningless.  *See Covenant Med. Ctr., Inc. v. Sebelius*, 994 F. Supp. 2d 862, 873 (E.D. Mich. 2014), *aff'd*, 603 F. App'x 360 (6th 2015).  Because the Providers' competing interpretation does not give effect to "every clause and word" of the statute, application of the canon against superfluity is inappropriate to require the court to adopt that interpretation.[3]

---

[3] Further, the U.S. Supreme Court has stated that "[t]he Affordable Care Act contains more than a few examples of inartful drafting" and therefore "specifically with respect to this Act, rigorous application of the canon [against surplusage] does not seem a particularly useful guide to a fair construction of the statute."  *King v. Burwell*, 135 S. Ct. 2480, 2492 (2015).  And, apart from the context of the ACA, the Court has recognized "[t]here are times when Congress enacts provisions that are superfluous."  *Microsoft Corp*, 564 U.S. at 106 (quoting *Corley*, 556 U.S. at 325).  This may be one of those times.  *See Covenant Med. Ctr., Inc. v. Burwell*, 603 F. App'x 360, 364 (6th Cir. 2015).

Nor can § 5504(c) otherwise be construed to require reopening.  The Providers point to a phenomenon called "negative pregnant with the affirmative," pursuant to which the statute must be construed to reflect a Congressional presumption that by "stating that reopening will *not* be required where there is *not* a pending appeal, it clearly meant that reopening *would be* required *where there is* a pending appeal."  [Doc. 30, p. 36 (emphasis in original)].  However, the Providers point to no Tenth Circuit authority adopting a "negative pregnant with the affirmative" construction, and the court declines to apply the principle in the first instance under the circumstances.  Rather, the Providers' interpretation "commits the fallacy of denying the antecedent."  *Ace Fire Underwriters Ins. Co. v. Romero*, 831 F.3d 1285, 1291 n.7 (10th Cir. 2016) (citing *TorPharm, Inc. v. Ranbaxy Pharm., Inc*., 336 F.3d 1322, 1329 n.7 (Fed. Cir. 2003)); *Covenant Med. Ctr., Inc.,* 994 F. Supp. 2d at 871-72.  The Providers state § 5504(c)'s prohibition against applying the amendments in a manner that requires reopening of settled hospital cost reports as to which there is not a jurisdictionally proper appeal pending, requires reopening in instances of a jurisdictionally proper pending appeal.  "But this does not logically follow, as an example illustrates:  Because it's not cold outside, it's not snowing.  It is now cold outside, therefore it must be snowing.'"  *Ace Fire Underwriters Ins. Co.*, 831 F.3d at 1291 n.7 (internal quotation omitted) (quoting *Agri Processor Co. v. NLRB*, 514 F.3d 1, 6 (D.C. Cir. 2008)).

Moreover, a requirement to reopen, as advocated by the Providers, is contrary to the well-recognized discretionary nature of the reopening decision.  *See* 42 C.F.R. § 405.1885(c); *Your Home Visiting Nurse Servs., Inc. v. Shalala*, 525 U.S. 449, 452 (1999).  Thus, the court cannot conclude that Congress intended § 5504(c) to impose a requirement to reopen settled cost reports as to which there is a jurisdictionally proper appeal pending.

Further, the Providers' interpretation requires the court to reach a second, equally, problematic conclusion—that Congress intended the new standards articulated in §§ 5504(a) and (b) to apply retroactively. This second conclusion runs afoul of the presumption against retroactive legislation.

> [T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.

*Landgraf v. USI Film Prods.,* 511 U.S. 244, 265 (1994) (internal footnote omitted). Thus, a court must not "give retroactive effect to statutes burdening private rights unless Congress had made clear its intent." *Id.* at 270; *see also Immigration & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 316 (2001) (quoting *Landgraf*, 511 U.S. at 316) ("A statute may not be applied retroactively, however, absent a clear indication from Congress that it intended such a result. 'Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits.'"). The presumption applies "in cases involving new monetary obligations that fell only on the government." *Landgraf*, 511 U.S. at 271 n.25; *Yale-New Haven Hosp. v. Leavitt,* 470 F.3d 71, 87 n.16 (2d Cir. 2006) (Medicare Act).

Section 5504 includes "no clear indication" that Congress intended § 5504(c) to be applied retroactively. Rather, "Congress expressly indicated in the statute itself what standards apply to what cost periods." *Covenant Med. Ctr., Inc.,* 994 F. Supp. 2d at 872. The Providers urge the court to construe § 5504(c) as a *limitation or qualification* of the effective dates included in §§ 5504(a) and (b), rather than a nullification, pursuant to the general/specific canon. However, as discussed above, the court does not construe § 5504(c) as a specific grant of permission. Further,

unlike §§ 5504(a) and (b), § 5504(c) does not explicitly relate to the calculation of FTE but, rather, to the appeals process.

Additionally, the court notes that, although the ACA's next section, § 5505, includes language that authorizes the Secretary to act retroactively, § 5504 includes no similar language. *Covenant Med. Ctr., Inc.,* 994 F. Supp. 2d at 874; *Cf.* Pub. L. No. 111-148 § 5505(c), 124 Stat. 119 (Mar. 23, 2010).  As recognized by a Sixth Circuit panel, "[t]hat language in turn creates a negative implication of its own: that Congress did *not* want the Act's reimbursement rules to be retroactive, period." *Covenant Med. Ctr., Inc.*, 603 F. App'x at 364 (emphasis in original).

Finally, the Providers invoke the "absurdity" exception to the plain language rule.  [Doc. 30, pp. 39-42].  Pursuant to the "absurdity" exception, the court must not apply a statute's plain language "where a plain language interpretation would lead to an outcome so 'absurd' that Congress clearly could not have intended such an outcome." *Resolution Tr. Corp. v. Westgate Partners, Ltd.*, 937 F.2d 526, 529 (10th Cir. 1991); *see also In re McGough*, 737 F.3d 1268, 1276 (10th Cir. 2013) ("[W]here a plain language interpretation of a statute would lead to an absurd outcome which Congress clearly could not have intended, we employ the absurdity exception to avoid the absurd result.").  However, the Tenth Circuit has stated that the "link between the 'absurdity' exception and congressional intent is crucial." *Resolution Trust Corp.*, 937 F.2d at 529.  "It is not enough for a court to find that upon application of the plain meaning of a statute, a given outcome is foolish.  Instead, a court so finding must be convinced that the result is so absurd that *Congress*, not the court, could not have intended such a result." *Id.* (emphasis in original). Accordingly, "[o]ne claiming that the plain, unequivocal language of a statute produces an absurd result must surmount a formidable hurdle." *Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006).  The doctrine applies "only when it would have been unthinkable for Congress to have

intended the result commanded by the words of the statute—that is, when the result would be 'so bizarre that Congress could not have intended it.'" *Id.* (quoting *Demarest v. Manspeaker*, 498 U.S. 184, 190-91 (1992)).

The Providers have failed to "surmount the formidable hurdle" to apply the absurdity doctrine. The Tenth Circuit has recognized that "the absurdity rule is 'a tool to be used to carry out Congress' intent—not to override it.'" *In re McGough,* 737 F.3d at 1276 (quoting *Resolution Trust Corp.*, 937 F.2d 529). The Providers argue that Congress could not have intended to render § 5504(c) entirely superfluous or absurd by requiring reopening with application of the original rule (against sharing). [Doc. 30, p. 41]. However, as previously stated, "[t]here are times when Congress enacts provisions that are superfluous." *Microsoft Corp*, 564 U.S. at 106. Further, applying the plain language does not create a result "so bizarre that Congress could not have intended it." *Robbins,* 435 F.3d at 1241. The plain language of § 5504(c) prohibits application of §§ 5504(a) and (b) "in a manner that requires reopening of any settled hospital cost reports as to which there is not a jurisdictionally appeal pending as of the date of the enactment of th[e] Act on the issue of payment" for IME and direct GME. The Providers argue that the Secretary's interpretation is unnecessary because it is well-established that the decision to reopen is discretionary. However, Congress could rationally have wished to clarify that issue with respect to certain claims. Moreover, insofar as the Providers assert that Congress could not have intended to permit reopening subject to the rule against sharing, the court "cannot reject the plain meaning of statutory language just because Congress may not have anticipated the result compelled by that language in a particular case." *Robbins*, 435 F.3d at 1242. Thus, the Secretary's interpretation does not lead to a result that is so "unthinkable" to warrant application of the absurdity doctrine. The plain language of § 5504 governs, and reopening is not required.

Finally, the court concurs with the conclusion of the U.S. District Court for the District of Maine, that "even if I were to conclude that the statutory language is ambiguous," the Secretary's interpretation of § 5504 constitutes "a permissible construction of the statute."  *See E. Maine Med. Ctr. v. Burwell,* 159 F. Supp. 3d 109, 120 (D. Me. 2016) (quoting *Chevron,* 467 U.S. at 838).[4]

B.     *Construction with the Plain Meaning of 42 C.F.R. § 413.78(g)(6) (2010)*

The Providers next contend that the Secretary's interpretation is inconsistent with 42 C.F.R. § 413.78(g)(6) (2010), and the Secretary's prior construction of that regulation.  Effective January 1, 2011, § 413.78(g) stated, in relevant part, as follows:

> (g) For cost reporting periods beginning on or after July 1, 2010, the time residents spend in nonprovider settings such as freestanding clinics, nursing homes, and physicians' offices in connection with approved programs may be included in determining the number of FTE residents in the calculation of a hospital's resident count if the following conditions are met—
>
> (2)     The hospital or hospitals must incur the costs of the salaries and fringe benefits of the resident during the time the resident spends in the nonprovider setting.  If more than one hospital incurs these costs, either directly or through a third party, the hospitals must count a proportional share of the time that residents train at the nonhospital setting(s) as recorded in a written agreement between the hospitals.
>
> ***
>
> (6)     The provisions of paragraphs (g)(1)(ii), (g)(2), (g)(3), and (g)(5) of this section cannot be applied in a manner that would require the reopening of settled cost reports, *except those cost reports on which*

---

[4] The Providers argue that the court should afford less deference to the Secretary's interpretation of § 5504 in light of the U.S. Supreme Court's decision in *Kisor v. Wilkie,* 139 S. Ct. 2400 (2019). In *Kiser,* the Court considered whether it should overrule the deference standard articulated in *Auer v. Robbins,* 519 U.S. 452 (1997), which defers to an agency's reasonable reading of a genuinely ambiguous regulation.  The Providers assert that, in *Kisor,* "the Supreme Court imposed significant new limits on when *Auer* deference applies."  [Doc. 30, p. 27].  Even if the *Kisor* opinion limits the applicability of *Auer* deference, *Kisor* relates to the appropriate deference to be given to an agency's interpretation of its governing regulations, not statutes.  *Kisor,* 139 S. Ct. at 2414; *see also id.* at 2425 (Roberts, C.J., concurring in part).

> *there is a jurisdictionally proper appeal pending on direct GME or*
> *IME payments as of March 23, 2010.*

42 C.F.R. § 413.78(g) (2010) (emphasis added).  The Providers argue that the phrase "except those

cost reports on which there is a jurisdictionally proper appeal" requires the reopening of costs

reports on which a pending appeal exists and application of the new standards set forth in §§

5504(a) and (b).   However, as recognized by the Sixth Circuit, effective October 1, 2014, the

Department of Health and Human Services amended § 413.78(g)(6) to state as follows:

> The provisions of paragraphs (g)(1)(ii), (g)(2), (g)(3), and (g)(5) of this section shall
> not be applied in a manner that requires reopening of any settled cost reports as to
> which there is not a jurisdictionally proper appeal pending as of March 23, 2010,
> on direct GME or IME payments. *Cost reporting periods beginning before July 1,*
> *2010 are not governed by paragraph (g) of this section.*

42 C.F.R. § 413.78(g)(6).[5]  "[A] new version of a regulation supersedes the old version as soon as

an agency adopts it in a final rule." *Covenant Med. Ctr., Inc*., 603 F. App'x at 364-65 (citing

*Smiley v. Citibank (S.D.), N.A.,* 517 U.S. 735, 741-42 (1996)).[6]  Thus, the amended version of §

413.78(g)(6) explicitly prohibits expense sharing through retroactive application of § 5504 and its

implementing regulation, § 413.78(g)(2).

The Providers argue that application of the version of § 413.78 that became effective on

October 1, 2014, raises retroactivity concerns because the amendment was a substantive change,

---

[5] Section 413.78 was subsequently amended effective May 8, 2020 with respect to the Public
Health Emergency associated with COVID-19.  Medicare and Medicaid Programs, Basic Health
Program, and Exchanges; Additional Policy and Regulatory Provisions in Response to the
COVID-19 Public Health Emergency, 85 Fed. Reg. 27,550, 27,623 (May 8, 2020).   The
amendment did not alter the language of subsection (g)(6).

[6] The Providers suggest some impropriety in the motivation behind the amendment, noting that
the Secretary amended the regulation while briefing was ongoing in *Covenant*.  The timing of the
amendment, in this instance, does not affect the court's deference determination. *See Smiley*, 517
U.S. at 741 ("Nor does it matter that the regulation was prompted by litigation, including this very
suit.").

rather than a "clarification" of existing policy as advocated by the Secretary.  At least one court has previously rejected this argument.  *E. Maine Med. Ctr.*, 159 F. Supp. 3d at 120 n.13 ("Because this new version of the regulation is merely a clarification of the Secretary's interpretation, it raises no retroactivity concerns.").  Nevertheless, in an abundance of caution, the court undertakes an independent analysis of the earlier version of the regulation.

Looking to its plain language, § 413.78(g)(6), as in effect from January 1, 2011 to September 30, 2014, explicitly stated that paragraph (g)(2), among others, "cannot be applied in a manner that would require the reopening of settled cost reports, except those cost reports on which there is a jurisdictionally proper appeal pending on direct GME or IME payments as of March 23, 2010."  42 C.F.R. § 413.78(g)(6) (2010).  As recognized by the district court in *Covenant*, paragraph (g)(6) is "almost identical" in effect to § 5504(c), *Covenant Med. Ctr., Inc.*, 994 F. Supp. 2d at 874, which, as discussed above, this court does interpret to require reopening.  Further, even assuming that paragraph (g)(6) could be construed to require reopening, paragraph (g)(2), permitting expense sharing, is explicitly limited to "cost reporting periods beginning on or after July 1, 2010." 42 C.F.R. § 413.78(g)(2).  Paragraphs (d), (e), and (f)—which do not permit expense sharing—provide the applicable standards for cost reports and discharges from January 1, 1999 through July 1, 2010.  The Providers urge the court to interpret paragraph (g)(6) as a limited exception pursuant to which the preceding paragraphs of subsection (g) can be applied to cost reports predating July 1, 2010.  However, it is well-established that "administrative rules will not be construed to have retroactive effect unless their language requires this result."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  Here, the plain language of § 413.78 requires application of the "all, or substantially all" standard to cost reports or discharges prior to July 1, 2010, and does not explicitly permit sharing.

Further, for the reasons discussed above, § 413.78 as effective from January 1, 2011 to September 30, 2014, reflects a reasonable agency interpretation of § 5504.[7]  *See Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002); *Chevron,* 467 U.S. at 843. In the preamble, or "Background Changes Made by the Affordable Care Act" section, of the final rule, in response to certain comments, the Secretary stated:

> There appears to be a misreading of our interpretation of section 5504(c).  The effective date of the provisions of section 5504 is clearly July 1, 2010.  This date is unambiguously stated in the plain text of section 5504(a), which states that it is "effective for cost reporting periods beginning on or after July 1, 2010."  Similarly, section 5504(b) is "effective for discharges occurring on or after July 1, 2010."  Our discussion of section 5504(c) in the August 3, 2010 proposed rule (75 FR 46385) only intended to explain our interpretation of the phrase "a jurisdictionally proper appeal pending" in the context of the plain language of the statute.  However, we are clarifying in this final rule that, as noted above, and unlike some other provisions of the Affordable Care Act, section 5504 is fully prospective, with an explicit effective date of July 1, 2010, for the new standards it creates.  Nothing in section 5504(c) overrides that effective date.  Section 5504(c) merely notes that the usual discretionary authority of Medicare contractors to reopen cost reports is not changed by the provisions of section 5504; it simply makes clear that Medicare contractors are not required by reason of section 5504 to reopen any settled cost report as to which a provider does not have a jurisdictionally proper appeal pending. **It does not require reopening in any circumstance; and the new substantive standard is, in any event, explicitly prospective.**  We believe if Congress had wanted to require such action or to apply the new standards to cost years or discharges prior to July 1, 2010, it would have done so in far more explicit terms.

Medicare Program: Payments to Hospitals for Graduate Medical Education Costs, 75 Fed. Reg. 71,800, 72,136 (Nov. 24, 2010) (emphasis added).  The Secretary's interpretation of § 5504 as only prospective is a permissible construction of that statute.

---

[7] Because the court concludes that the agency's interpretation of the administrative rule does not conflict with the text of § 413.78 itself, the Providers' discussion of *Saint Francis Medical Center v. Azar*—which the Providers cite for the proposition that, where there is a conflict between the mixed signals contained in a preamble statement and the clear text of a regulation, the regulation controls—is inapposite.  *See* [Doc. 30, p. 43 (citing 894 F.3d 290, 297 (D.C. Cir. 2018))].

C.      *Notice and Comment Rulemaking*

Regardless, the Providers argue that the Secretary is precluded from applying his interpretation of § 5504 because it was not the product of proper notice-and-comment rulemaking. Specifically, the Providers contend that the final rule, effective January 1, 2011, was not a "logical outgrowth" of the proposed rule and therefore is ineffective. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014). The Providers point to the Secretary's statements in the preamble of the proposed § 413.78:

> Section 5504(c) of the Affordable Care Act specifies that the amendments made by the provisions of sections 5504(a) and (b) shall not be applied in a manner that would require the reopening of settled cost reports *except where the provider has a jurisdictionally proper appeal pending on the issue of direct GME or IME payments as of March 23, 2010 (the date of the enactment of Pub. L. 111-148). We are proposing to interpret "pending, jurisdictionally proper appeal on direct GME or IME payments" to mean that in order for a hospital to request a change to its FTE count, direct GME or IME respectively, the "pending, jurisdictionally proper appeal" must be specific to direct GME or IME respectively.* For example, in order for a hospital to increase its FTE count with regard to an ACA provision that is unique to IME (such as inclusion in the IME count of didactic time occurring in the hospital as specified by new section 1886(d)(5)(B)(x)(II)), the hospital's "pending, jurisdictionally proper appeal" must be on an IME issue; IME FTEs or the available bed count. However, if the hospital's "pending, jurisdictionally proper appeal" is on an issue that only affects direct GME payments, such as the initial residency period or the Medicare patient load, that appeal would not be sufficient in order for the hospital to increase its FTE count with regard to an ACA provision that is unique to IME, such as didactic time in the hospital setting.

Medicare Program; Proposed Changes to Payments to Hospitals for Certain Inpatient Hospital Services and for Graduate Medical Education Costs, 75 Fed. Reg. 46,169, 46,385 (proposed Aug. 3, 2010) (emphasis added). Based on this language, the Providers argue that stakeholders could not have anticipated that the Secretary would adopt an interpretation of § 5504 so as to not require reopening.

Courts have recognized that "[a]n agency may promulgate a rule that differs from a proposed rule only if the final rule is a 'logical outgrowth' of the proposed rule." *Allina Health*

*Servs.*, 746 F.3d at 1107 (quoting *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012)); *see also Mkt. Synergy Grp., Inc. v. U.S. Dep't of Labor*, 885 F.3d 676, 681 (10th Cir. 2018).  "A final rule qualifies as a logical outgrowth if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period."  *Market Synergy Grp., Inc.*, 885 F.3d at 681 (internal quotations omitted) (quoting *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079-80 (D.C. Cir. 2009)).

Here, the Secretary stated that the agency was "proposing to interpret" § 5504(c) to permit a hospital to request a change to its FTE count only if a "pending, jurisdictionally proper appeal" exists that is specific to direct GME or IME respectively.  However, "[o]ne logical outgrowth of a proposal is surely . . . to refrain from taking the proposed step."  *Stringfellow Mem'l Hosp. v. Azar*, 317 F. Supp. 3d 168, 187 (D.D.C. 2018) (quoting *New York v. U.S. Envtl. Protection Agency*, 413 F.3d 3, 44 (D. C. Cir. 2005)); *see also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845 (1986) ("It goes without saying that a proposed regulation does not represent an agency's considered interpretation of its statute and that an agency is entitled to consider alternative interpretations before settling on the view it considers most sound.").  Further, the Secretary noted that many commenters "disagreed" with the interpretation of § 5504(c) of the proposed rule and that some commenters read the proposed application provisions of § 5504(c) to permit application of the provisions of §§ 5504(a) and (b) to cost reporting periods prior to July 1, 2010.  75 Fed. Reg. at 72,136.  Although not dispositive, the comments suggest that the various parties anticipated that the final rule might adopt a contrary interpretation.  *Mkt. Synergy Grp., Inc.*, 885 F.3d at 681 (internal quotations omitted).  Finally, the court notes that the Secretary's interpretation does not constitute a change to a longstanding existing practice, disguised as a "clarification," as the

Secretary was amending a regulation consistent with his interpretation of a new statute.  *Cf. Allina Health Servs.,* 746 F.3d at 1108; *see also Abington Mem'l Hosp. v. Burwell*, 216 F. Supp. 3d 110, 134 (D.D.C. 2016) ("To read Allina as Plaintiffs' [*sic*] do—i.e., as standing for the proposition that the mere appearance of the word 'clarify' in a proposed rule makes it *per se* impossible for regulated entities to anticipate that a change is being made—goes much too far, and that is especially evident where, as here, the agency's proposed rule otherwise makes it abundantly clear that the policy being proposed is, in fact, a 'change' and a 'revision' of a previous rule.").

More fundamentally, however, the Providers overlook the fact that the cited portion of the proposed rule says nothing of the applicability of §§ 5504(a) and (b), and is directed solely to interpreting the phrase "pending, jurisdictionally proper appeal" in the context of § 5504(c).  Throughout the proposed rule, the Secretary explicitly states that sharing of expenses shall be permitted only after July 1, 2010.  *See* 75 Fed. Reg. at 46,385 (emphasis added) ("We also are proposing to add a new § 413.78(g) that details how hospitals should count residents that train in nonhospital sites for cost reporting periods *beginning on or after July 1, 2010.*); *id.* at 46,386 (emphasis added) ("Therefore, these statutory changes now allow hospitals to share the costs of resident training at nonhospital sites, so long as those hospitals divide the resident time proportionally pursuant to a written agreement, for the purposes of determining their respective direct GME and IME FTE resident counts at the nonhospital site.  These provisions of the statute are effective for cost reporting periods beginning on or after July 1, 2010 for direct GME, and for discharges occurring on or after July 1, 2010 for IME.  Accordingly, *although hospitals that shared training costs at nonhospital sites could not count any of resident time spent training at those nonhospital sites prior to July 1, 2010, hospitals can count all of that training time beginning on or after July 1, 2010, as long as they divide the resident training time proportionally.*").  Thus, the

- 19 -

proposed rule makes clear that §§ 5504(a) and (b) shall not apply retroactively, only prospectively, and is therefore not an impermissible "switcheroo." Accordingly, the Secretary's final rule, which prohibits expense sharing in cost reporting periods prior to July 1, 2010, is clearly the "logical outgrowth" of the proposed rule.[8]

Thus, for the reasons discussed above, insofar as the preamble to the final rule reflects the agency's interpretation of administrative rule § 413.78, rather than a statute, if the court were to construe § 413.78 as ambiguous (which it does not), the rule reflects the agency's "'fair and considered' judgment." *Cf. Kisor*, 139 S. Ct. at 2417-18 ("[A] court may not defer to a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties.").[9]

D.      *Pre-ACA Laws and Regulations*

Finally, in the alternative, the Providers argue that residents rotating to shared nonhospital settings must be included under the pre-ACA law and regulations because: (1) the anti-sharing policy was not enacted through notice and comment rulemaking as required by the Medicare statute's heightened standards, and (2) the anti-sharing policy is not entitled to *Auer* deference.

---

[8] For this reason, the court concurs with the U.S. District Court for the District of Maine that new version § 413.78, which became effective October 1, 2014, "is merely a clarification" of the Secretary's interpretation of existing policy as set forth in the version of § 413.78 in effect from January 1, 2011 to September 30, 2014. *Eastern Maine Med. Ctr.*, 159 F. Supp. 3d at 120 n.13; *see also Falaniko v. Mukasey*, 272 F. App'x 742, 749 (10th Cir. 2008) (regulation that clarified agency's pre-existing position is "not impermissibly retroactive").

[9] The Providers also contend that deference is not required because interpretation of ACA does not implicate the agency's substantive expertise. *See Kisor*, 139 S. Ct. at 2417. However, Congress granted the Secretary authority to issue regulations "giving content to the broad outlines of the Medicare statute." *Thomas Jefferson Univ.*, 512 U.S. at 506-07; *see also* 42 U.S.C. § 1395ww(h)(4). Further, judicial deference to an agency's interpretation of a statute implicates *Chevron*, rather than *Auer*, deference. *See Kisor*, 139 S. Ct. at 2425 (Roberts, C.J., concurring in part).

1.      Notice and Comment Rulemaking of Anti-Sharing Rule

As previously stated, Congress granted the Secretary authority to promulgate regulations

necessary to administer the Medicare program.  *See* 42 U.S.C. § 1395(a)(1).  However, pursuant

to the statute and subject to limited exceptions, the Secretary may not impose a "rule, requirement,

or other statement of policy . . . that establishes or changes a substantive legal standard" unless the

Secretary provides "notice of the proposed regulation in the Federal Register and a period of not

less than 60 days for public comment thereon."  42 U.S.C. § 1395hh(a)(2), (b)(1); *see also Azar v.*

*Allina Health Servs.,* 139 S. Ct. 1804, 1817 (2019).  The Providers contend that the anti-sharing

policy, or single hospital requirement, established a substantive legal standard so as to warrant

notice and comment, but that the Secretary did not provide it.  The court respectfully disagrees.

On May 8, 1998, the Secretary promulgated proposed rules with respect to payment of

direct GME for nonhospital time.  Specifically, the Secretary offered the following payment

proposal:

> In light of the numerous considerations discussed above, we are proposing a system
> whereby we will pay *either* the hospital or the nonhospital site for the cost of
> training in the nonhospital site, *depending on which entity incurs "all or*
> *substantially all" of the costs of training in the nonhospital site.*  An entity incurs
> "all or substantially all" of the costs for the training program in the nonhospital
> setting if it pays for, at a minimum:  that portion of the costs of the teaching
> physicians' salaries and fringe benefits that are related to the time spent in teaching
> and supervision of residents; and residents' salaries and fringe benefits (including
> travel and lodging expenses where applicable).

Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal

Year 1999 Rates, 63 Fed. Reg. 25,576, 25,597-25,598 (May 8, 1998) (emphasis added).  Thus,

under the proposed rule, a hospital could include a resident's nonhospital training time in the

hospital's FTE counts for direct GME and IME, only "*if the hospital itself* incurs 'all or

substantially all' of the costs for the training program in the nonhospital setting." 63 Fed. Reg. at

25,599 (emphasis added); *see also id.* ("The hospital would have to assume 'all or substantially all' of the training costs for that nonhospital training time in order to avail itself of the benefit of including the resident in the hospital's FTE count for IME and direct GME purposes based on the proposed modifications to § 413.86."[10]

On July 31, 1998, the Secretary promulgated the revised regulation, which provided that "[u]nder sections 1886(d)(5)(B)(iv) and 1886(h)(4)(E) of the Act a hospital may include the time a resident spends in nonprovider settings in its indirect medical education (IME) and direct GME full-time equivalent count if it incurs 'all or substantially all' of the costs of training residents in the nonhospital site" Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1999 Rates, 63 Fed. Reg. 40,954, 40,986 (July 31, 1998); *see also id.* at 63 Fed. Reg. at 40,989. In conjunction with the revised rule, the Secretary responded to commenters who expressed concern "that if neither the hospital or nonhospital site incurs 'all or substantially all' of the costs, neither setting would receive payment even though each entity incurs a portion of the training costs." 63 Fed. Reg. at 40,995. Specifically, one commenter suggested that the Secretary "should encourage affiliations and provide simpler and clearer guidance for institutions." *Id.* The Secretary responded:

> Under this final rule, an entity must incur "all or substantially all" of the costs to receive payments for the time the resident spends in the nonhospital site. Since we do not conduct cost-finding to determine who bears "all or substantially all" of the graduate medical education costs, we are generally dependent on hospital and non-hospital provider agreements to determine who bears them. As stated earlier in this final rule as well as in the proposed rule, we do not believe it would be administratively feasible to apportion payments appropriate to the hospital and nonhospital site in situations where neither the hospital or nonhospital site agree on

---

[10] Section 413.86 was redesignated as 42 C.F.R. § 413.78(d) without substantive changes for cost reporting periods after October 1, 2004. *See* Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates, 69 Fed. Reg. 48916, 49,111-49,112 (Aug. 11, 2004).

who incurs "all or substantially all" of the costs.  We must also consider the statutory prohibition on double payments in these situations.  Furthermore, although it may be appropriate to provide payment for GME costs where the nonhospital site incurs only a portion of the training costs, we do not believe it would be equitable to allow a nonhospital site to be paid where it was incurring only a portion of the costs but only allow payment to a hospital when it incurs "all or substantially all" of the costs.

In response to the commenter who suggested that we should encourage "affiliations," we believe the revised definition of "all or substantially all" of the costs provides incentives for hospitals and nonhospital sites to reach agreement with regard to financial arrangements for training in nonhospital sites to avoid the situation where neither entity receives payment for GME.

*Id.*  Although not dispositive, that affected persons commented regarding potential "affiliations" further suggests adequate notice and comment.  *Market Synergy Grp., Inc.*, 885 F.3d at 681 (internal quotations omitted). Thus, the 1998 regulation provided notice of the Secretary's policy to require that a single hospital incur "all or substantially all" of the costs of direct GME and IME.[11]

_____

[11] Further, in 2003, the Secretary again submitted the single hospital requirement to notice and comment.  *See* Medicare Program; Proposed Changes to Payments to Hospitals for Certain Inpatient Hospital Services and for Graduate Medical Education Costs, 68 Fed. Reg. 45,346, 45,449 (Aug. 1, 2003) (emphasis altered from original) ("We understand the concerns of the commenters about the requirement for a hospital to incur 'all or substantially all of the cost' of training residents in a training program at a nonhospital site.  However, we do not believe this is a change in policy.  We believe that the policy that requires a hospital to incur the cost of 'the program' in the nonhospital site has existed since the passage of the direct GME provisions . . . and the passage of the IME provision . . . that permitted hospitals to continue to count residents in nonhospital sites, for purposes of direct GME and IME payment, if the hospital incurred 'all or substantially all of the cost' of residents training in the program.").

Although the Providers argue that the proposed rule and subsequent regulation related only to payments for direct GME to qualified nonhospital providers,[12] in the proposed rule, the Secretary specifically stated

> In the course of developing our policies for nonhospital providers, we have reviewed our method for paying hospitals for the costs of training residents in the nonhospital site. Accordingly, as part of our policy to pay nonhospital providers for the costs of training residents, *we are proposing necessary and appropriate modifications to our current policy for paying hospitals for such nonhospital training.* Specifically, as part of our proposal to implement section 1886(k) of the Act, we propose to modify the regulations at § 413.86(f).

63 Fed. Reg. at 25,597 (emphasis added); *see also* 63 Fed. Reg. at 40,986 ("Additionally, we proposed that, under certain circumstances, a hospital may continue to receive GME payments for residents who train in the nonhospital setting.").[13]

For the foregoing reasons, the court concludes that, in 1998, the Secretary submitted the legal standard requiring a single hospital to pay "all or substantially all" of the costs of training by

---

[12] A "qualified nonhospital provider" is defined as a federally qualified health center, a rural health clinic, Medicare+Choice organizations, and such other providers (other than hospitals) as the Secretary determines to be appropriate. 42 U.S.C. § 1395ww(k)(2).

[13] In reply, the Providers cite, for the first time, the decision by the U.S. District Court for North Dakota in *Medcenter One Health Systems v. Leavitt*, 666 F. Supp. 2d 1043 (D.N.D. 2009), in which the court concluded that the 1998 regulations did not "establish a policy prohibiting hospitals from splitting the total costs of a medical residency training program." *Id.* at 1061. However, that decision was subsequently reversed by the Eighth Circuit Court of Appeals. *See Medcenter One Health Sys. v. Sebelius*, 635 F.3d 348 (8th Cir. 2011). Further, the district court considered the appropriate reimbursement owed to a qualified non-hospital provider for direct GME costs, not a hospital, and focused on the term "program" as used in the statute and regulations, an issue not explicitly raised by the parties herein. *Medcenter One Health Sys.*, 666 F. Supp. 2d at 1055-61. Moreover, the *Medcenter* district court did not specifically consider the foregoing regulations in its order granting plaintiff's motion for summary judgment and denying defendant's motion for summary judgment. *Id.*

residents at nonhospital sites to notice and comment.[14]  Because the Secretary satisfied the notice and comment requirement for its one hospital, or anti-sharing, policy, that standard governs the applicable time period.

2.      Appropriate Deference

Finally, the Providers argue that, even if properly subject to notice and comment, the Secretary's prohibition against sharing expenses, and requiring a single hospital to pay "all or substantially all" of the training costs, is an unreasonable interpretation of the statute and therefore entitled to no deference.

As previously stated, the Tenth Circuit generally applies the two-step test established in *Chevron,* to determine whether an agency acted within its statutory authority.  *WildEarth Guardians*, 784 F.3d at 683.  Because § 413.78 and the single hospital requirement reflect the agency's interpretation of § 1395ww(d)(5)(B)(iv) and 1395ww(h)(4)(E), permitting reimbursement if the hospital incurs "all, or substantially all" of the costs for training, the court applies *Chevron* deference.

As previously stated, pursuant to the *Chevron* test, the court must first determine "whether Congress has directly spoken to the precise question at issue."  *Chevron, U.S.A., Inc.,* 467 U.S. at 843.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.*  If, however,

---

[14] Further, the court notes that *Allina Health Services* is factually distinguishable.  *Allina Health Servs.,* 139 S. Ct. 1804.  There, the government admitted that it had not provided notice and comment, but argued it was not required to do so under the circumstances.  *Id.* at 1810.  In addition, the policy change related to a spreadsheet posted on the Medicare website announcing the 2012 Medicare fractions, which "dramatically—and retroactively—reduced payments to hospitals serving low-income patients."  *Id.* at 1808, 1810.  Here, the anti-sharing rule, as the Providers dub it, reflects longstanding Medicare policy.

"the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.*

Here, § 1395ww is silent as to whether the "all or substantially all" requirement permits sharing.  *See Borgess Med. Ctr. v. Sebelius*, 966 F. Supp. 2d 1, 6 (D.D.C. 2013).  Thus, the court must consider whether the anti-sharing policy constitutes a permissible construction of the statute.

The Providers argue that the agency's construction is unreasonable based primarily on its failure to consider the effect of 1 U.S.C. § 1, known as the Dictionary Act.  Pursuant to § 1, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . words importing the singular include and apply to several persons, parties, or things."  However, the U.S. Supreme Court has characterized reliance on the Dictionary Act as "rare" and only when "necessary to carry out the evident intent of the statute."  *United States v. Hayes,* 555 U.S. 415, 422 n.5 (2009) (quoting *First Nat'l Bank in St. Louis v. Missouri*, 263 U.S. 640, 657 (1924)).  The Providers argue that prohibiting expense sharing is contrary to Congress's intent to expand resident training in nonhospital sites, rather than reducing it.  However, the Secretary addressed this specific issue and concluded the rule was sufficient to encourage training in nonhospital sites.  *See* 63 Fed. Reg. at 25,597.

Further, the Medicare statute itself does not suggest that application of the Dictionary Act is appropriate.  As previously stated, the "all or substantially all" requirement relates to determining a hospital's approved FTE requirement, which, in turn, is relevant to the hospital's "aggregate approved amount."  42 U.S.C. § 1395ww(h)(3).  The "aggregate approved amount" is used to determine, in part, the hospital payment amount per resident "for *a* hospital cost reporting period beginning on or after July 1, 1985."  42 U.S.C. § 1395ww(h)(3)(A).  The Tenth Circuit has recognized that "in most contexts, the singular article 'a' refers to only one item."  *Banuelos v.*

*Barr*, 953 F.3d 1176, 1181 (10th Cir. 2020).  Thus, when read in the context of § 1395ww(h)(3), the use of the singular article "a" followed by the phrase "*the* hospital incurs all, or substantially all, of the costs," suggests that Congress did not intend to include the plural with the singular. Moreover, Congress later used alternative language in the ACA to explicitly apply to circumstances in which more than one hospital incurs the training costs.  *See Borgess Med. Ctr*., 966 F. Supp. 2d at 7; *see also* Patient Protection and Affordable Care Act, Pub. Law No. 111-148 (ACA), *as enacted*, 42 U.S.C. §§ 1395ww(h)(4)(E) and 1395ww(d)(5)(B).

Finally, even if the Providers offer a "better" interpretation, *Chevron* does not ask whether the agency's interpretation is "best," only if it is permissible.  *Aposhian v. Barr*, 958 F. 3d 969, 984-85 (10th Cir. 2020) (quoting *Atl. Mut. Ins. Co. v. Comm'r of Internal Revenue*, 523 U.S. 382, 389 (1998)) ("[T]he task that confronts us is to decide, not whether [the agency's interpretation is] the best interpretation of the statute, but whether it represents a reasonable one."); *Hardy Wilson Mem'l Hosp. v. Sebelius*, 616 F.3d 449, 458 (5th Cir. 2010).

Nor does the fact that some Medicare administrative contractors permitted cost sharing after promulgation of the 1998 regulation suggest that the Secretary's interpretation is unreasonable.  *See Thomas Jefferson Univ.*, 512 U.S. at 517; *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 65 (1984); *Mich. Dep't of Cmty. Health v. Sec'y of Health & Human Servs.*, 496 F. App'x 526, 535 (6th Cir. 2012) ("The fiscal intermediary's role, however, is that of a conduit; it is not tasked with or given the power to resolve policy questions.").  For the reasons set forth herein, the court concludes that the agency's construction is a reasonable, and therefore permissible, construction.  *See Borgess Med. Ctr.,* 966 F. Supp. 2d at 7.  Thus, the court defers to the interpretation.

Further, insofar as the rule reflects the agency's interpretation of its regulations, the court would afford it deference and therefore the agency's reliance was not arbitrary, capricious, or contrary to law.  As discussed above, the policy was the subject of notice and comment as early as 1998.  It was not introduced in this litigation as a "*post hoc* rationalization," but rather appears to have been the Secretary's policy since at least 1998.   Therefore, the interpretation does not constitute a mere "*ad hoc* statement" or "unfair surprise."  Nor is the subject matter "distant from the agency's ordinary duties," *Kisor,* 139 S. Ct. at 2417, because, as previously stated, Congress has tasked the Secretary with promulgating rules to implement the Medicare statutes, including computation of FTE.  *See* 42 U.S.C. § 1395ww(h)(4).  Thus, the court concludes that the anti-sharing rule falls with the Secretary's "significant leeway to say what its own rules mean," *Kisor,* 139 S. Ct. at 2418, and therefore defers to the interpretation.

## IV.    Conclusion

WHEREFORE, the court concludes that the January 25, 2019 decision of the Provider Reimbursement Review Board (PRRB), designated Decision Number 2019-D11, is not arbitrary, capricious, an abuse of discretion, or contrary to law.   Therefore, the Motion for Summary Judgment [Doc. 30] of plaintiffs Saint Francis Hospital, Inc., AHS Hillcrest Medical Center, LLC, and St. John Medical Center is denied.  The Motion for Judgment on the Administrative Record [Doc. 33] of defendant Alex M. Azar, the Secretary of Health and Human Services, is granted.

DATED this 4th day of August, 2020.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE